IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

FRANCISCO BAGU,

      Plaintiff,

v.                                 Case No. 5:21-cv-00572

LT. K. CRAWFORD, et al.,

      Defendants.

**PROPOSED FINDINGS AND RECOMMENDATIONS**

Plaintiff, Francisco Bagu (hereinafter also referred to as "Bagu"), proceeding *pro se* and currently incarcerated at United States Penitentiary Canaan in Waymart, Pennsylvania, seeks damages under *Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), for alleged violations of his civil rights that occurred when he was an inmate at Federal Correctional Institution ("FCI") Beckley. This matter is assigned to the Honorable Frank W. Volk, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for total pretrial management and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

Currently pending is Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. (ECF No. 39). Bagu was given notice pursuant to *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir. 1975) of his right and obligation to respond to the combined motion to dismiss and motion for summary judgment. (ECF No. 43). However, no response from Bagu has been forthcoming. Accordingly, Defendants' motion is ready

for disposition. After thoroughly considering the arguments and supporting materials, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, (ECF No. 39), on the ground of Plaintiff's failure to exhaust administrative remedies; **DISMISS** the complaint, (ECF No. 1); and **REMOVE** this case from the docket of the Court.

## I.     **Bagu's Complaint**

Bagu complains about events at FCI Beckley, which occurred on March 8, 2021. He claims that he suffered a series of assaults by correctional officers that began with a pat down outside of his cell on a general population unit and ended after Bagu was taken to the special housing unit ("SHU"). He names six defendants and alleges the following about each:

1.   Lieutenant K. Crawford: On March 8, 2021, Crawford came to Bagu's cell to conduct a pat down. (ECF No. 1 at 7). During this process, Crawford ordered Bagu to pull up his pants, and while Bagu was attempting to follow the order, Crawford and Officer G. Shamblin threw Bagu to the ground and punched him. (*Id.*) Crawford denied Bagu medical attention after the assault. According to Bagu, the assault was captured by the video surveillance camera in the housing unit. Bagu also complains that he was continuously harassed by Crawford, who would show up at Bagu's cell and destroy his personal property. (ECF No. 1-1 at 1). Bagu claims that he was often the recipient of racial epithets from the guards and was verbally abused. (*Id.* at 1-2).

In a supplemental filing, Bagu attaches incident reports submitted by Crawford and  accuses Crawford of "changing his story" about the unprovoked assault. (ECF No. 38 at 1-4). Bagu points out that in a report completed by Crawford on March 8, 2021,

Crawford claimed that during the pat down Bagu attempted to head butt Crawford and then struck Crawford in the chest. (ECF No. 38 at 2). Bagu claims that Crawford is lying, and the security video will show that Bagu was simply trying to follow Crawford's orders when he was slammed violently to the floor. (*Id*.). Bagu notes that Crawford re-wrote the incident report on March 22, 2021, eliminating the portion of the March 8 report which claimed that Bagu tried to head butt Crawford. (*Id*. at 4). He states that Crawford would occasionally come by his cell after the attacks and tease him. (ECF No. 1-1 at 3).

2. <u>Lieutenant O. Spradlin</u>: On March 8, 2021, after the pat down incident, Spradlin transported Bagu to the SHU and, while walking to the unit, Spradlin slammed Bagu down onto the concrete walkway. (ECF No. 1 at 8). Bagu claims that Spradlin and several other officers then beat him until he lost consciousness. (*Id*.). Bagu was again denied medical attention after this attack. Bagu claims that Spradlin's assault was also recorded by the prison's video surveillance camera. (*Id*.). Bagu attaches a March 8, 2021 incident report prepared by Spradlin describing Bagu's behavior during his escort to the SHU. (ECF No. 38 at 6). Spradlin claims that Bagu turned his body aggressively and attempted to pull away from Spradlin, which forced him to place Bagu on the ground and apply leg restraints. (*Id*.). Bagu alleges that the camera footage will show that Spradlin threw him to the ground for no reason, and that other officers punched him even though he was in handcuffs. (*Id*.). Bagu further contends that Spradlin was present in the SHU during an assault on Bagu by Officer Frobles, and Spradlin turned off a handheld camcorder, which was intended to document the officers' contact with Bagu, in order to eliminate evidence of the beating. (ECF No. 1 at 8). Bagu states that Spradlin turned off the camcorder a second time to eliminate video proof of Bagu's subsequent beating by Officers Frobles, Taylor, and Williams. Bagu was denied medical attention afterward. (*Id*.).

3

3. <u>Officer G. Shamblin</u>: During the March 8, 2021 pat down, Shamblin participated in the assault initiated by Crawford. (ECF No. 1 at 7). Bagu attaches an incident report prepared by Shamblin on March 8 and claims that it is false. (ECF No. 38 at 5). He notes that Shamblin repeated Crawford's story about the head butt and also points out that Shamblin claimed Bagu tried to strike him even though Bagu was already in handcuffs. Bagu asks "how can I throw a [punch] or swing my fist" when handcuffed. (*Id.*).

4. <u>Officer Frobles</u>:  On March 8, 2021, Frobles conducted a body search of Bagu in the SHU. (ECF No. 1 at 8). During the search, Frobles repeatedly punched Bagu in the ribs despite Bagu being handcuffed and shackled. Bagu was denied medical attention after this attack.

5. <u>Officer Taylor</u>:  At some point on March 8, 2021, Taylor, Williams, and Frobles punched Bagu and violently and repeatedly tugged on his genitalia. (ECF No. 1 at 9). They also removed his watch and stole it. Bagu was denied medical attention after the attack.

6. <u>Officer Williams</u>: On March 8, 2021, Williams conducted a pat down of Bagu in the SHU and punched him in the ribs while he was handcuffed and shackled. (ECF No. 1 at 8). Bagu was denied medical attention afterward. (*Id.*).

7. <u>Additional claims</u>: Bagu asserts that his cellmate, Alexander Hamilton, tried to help him after the assaults, but by the next day, Bagu's pain and bruising were worse, and his right testicle was swollen to the size of a handball. (ECF No. 1-1 at 3). Bagu claims that he was left shackled in the SHU for over thirty hours and his continued pleas for medical attention were denied. (*Id.*). Bagu claims that the beatings he suffered on March 8, 2021 left his ribs severely bruised for over two weeks. In addition, he sustained permanent swelling of his right testicle. He now has difficulty sleeping and is anxious, stressed, and depressed. (ECF No. 1 at 9). Bagu states that he fears being a victim of similar violence

from other correctional officers. (ECF No. 1 at 9). For relief, Bagu seeks $50,000 in compensatory damages, $50,000 in punitive damages, and injunctive relief. (*Id.*).

Bagu concedes that he did not exhaust remedies prior to filing the instant action. (ECF No. 1 at 4). He claims, however, that his case manager, Mr. Harvey, and the unit manager, Mrs. Stapples, denied him access to grievance forms.[1] (ECF No. 1 at 4; ECF No. 1-1 at 3). Bagu indicates that he eventually notified a SIS Lieutenant about the sexual abuse committed by Williams, Taylor, and Frobles. (ECF No. 1-1 at 3-4).

## II.    Motion to Dismiss, or for Summary Judgment

Defendants argue that the complaint should be dismissed for three overarching reasons; including, that Bagu has failed to exhaust administrative remedies, fails to state valid constitutional claims, and makes allegations that are either factually unsupported by the record or are precluded by the defendants' qualified immunity. (ECF No. 39). In support of their position, the defendants emphasize that Bagu's excuse for failing to exhaust administrative remedies is unsubstantiated and conclusory, making it insufficient to withstand summary judgment. (ECF No. 42 at 13). Defendants refute Bagu's allegation that staff refused to provide him with the proper forms, indicating that 138 administrative remedies were filed by FCI Beckley inmates between March 1 and July 31, 2021, and none of them were hindered by staff. Defendants note that Bagu has not filed a single administrative remedy since being incarcerated in a Federal Bureau of Prisons ("BOP") facility. (*Id.* at 16-17). They further note that Bagu requested and was provided with a property tort claim form that he prepared on March 10, 2021, suggesting

---

[1] In the complaint, Bagu identifies the staff that refused him an administrative remedy form as the "counselor" and the "unit manager." (ECF No. 1 at 4). However, in his attached letter, he identified the staff members as "Mrs. Stapples, unit manager" and "Mr. Harvey, case manager." (ECF No. 1-1 at 3). The discrepancy between the two is important, because Mr. Harvey was not Bagu's counselor at the relevant time. Bagu's counselor was Jeremy James. (ECF No. 39-2 at 3).

that he could have filed an administrative remedy at the same time. In addition, he was able to submit a report of staff misconduct to the BOP's Office of Internal Affairs ("OIA") and received the forms to institute litigation in federal court, both of which refute Bagu's unsupported claim of staff interference. (ECF No. 42 at 17).

Defendants further argue that Bagu has included frivolous claims in his complaint that should be summarily dismissed. (*Id.* at 17-21, 25-26). Defendants indicate that Bagu's property loss and verbal harassment claims do not rise to the level of a constitutional violation and thus are not cognizable in a civil rights action, and that there is no private right of action for him to pursue a claim under the Prison Rape Elimination Act ("PREA").

Defendants also contend that Bagu's claims of excessive force are simply not corroborated by the records and video evidence. (*Id.* at 19). They point out that Bagu claims permanent injuries from the alleged assaults, but he never reported some of the asserted injuries and declined medical care. (*Id.* at 19). Defendants have produced records and security video in support of their motion. They argue that this evidence unequivocally reveals the spuriousness of Bagu's allegations. For example, they contend that the restraint record does not support Bagu's claim that he was in restraints for thirty hours, as the record reflects that Bagu was in restraints for eighteen hours and received all of the mandated checks. (*Id.* at 19, 24). They claim the video evidence likewise contradicts Bagu's assertion that Spradlin turned off the recording device at times to prevent documenting Bagu's beatings, stating that there are no gaps in the film. Defendants posit that BOP records are entitled to a presumption of regularity, and the records clearly disprove Bagu's allegations. (ECF No. 42 at 21). They argue that the records show that they exerted only the amount of force necessary to subdue Bagu, who was aggressive and uncooperative. (*Id.* at 23-24). They argue that they are entitled to qualified immunity in

relation to their treatment of Bagu in March 2021, because neither the records nor the video show a constitutional violation on the part of any of the officers who subdued and transported Bagu. (ECF No. 42 at 28-29).

Defendants submit the following evidence:

1. The declaration of Michael Austin, a Special Investigative Services ("SIS") Lieutenant at FCI Beckley, who has reviewed relevant BOP records and provides information regarding their contents. (ECF No. 39-1 at 2-10). Of note, Austin states that Bagu was an inmate at FCI Beckley from December 5, 2019 through July 27, 2021. (*Id.* at 2). Upon his arrival, Bagu was placed in general population, which is the least restrictive housing at FCI Beckley. On several occasions, he was placed in the SHU, which is more restrictive housing for inmates that are under disciplinary investigation, in protective custody for their safety, in disciplinary segregation, or otherwise require additional security. (*Id.* at 3). Austin indicates that on March 8, 2021, Bagu was in general population. Around 7:00 p.m., Officers Crawford and Shamblin were in Bagu's housing unit conducting random cell searches for contraband. (*Id.*). While searching a cell in the unit, they heard a commotion coming from another cell, which turned out to be the cell occupied by Bagu. They looked into the window of Bagu's cell and saw him throwing his personal property on the floor. When they asked Bagu what he was doing, he said he was saving them the trouble. Due to this erratic behavior, Bagu was asked to exit his cell and submit to a pat down. (*Id.*). Bagu was told to put his hands on the wall, and when Crawford began to search, Bagu dropped his hands off the wall and appeared to reach for his waistband. This was concerning, because inmates are known to conceal weapons, such as prison-made shanks, in their waistbands. Bagu then clenched his fists and struck Crawford in the chest. Crawford placed Bagu on the floor and applied hand restraints,

7

with Shamblin assisting. Other officers arrived and took control of Bagu. (ECF No. 39-1 at 4). Crawford left the institution at 10:00 p.m. and did not return until 2:00 p.m. the following day.

Austin states that one of the officers who took control of Bagu was Spradlin. (*Id.*). While Spradlin was taking Bagu out of the housing unit and across the compound, Bagu attempted to pull away, at which time Spradlin placed Bagu on the ground and held him until other officers could assist. (*Id.*). He was placed in ambulatory restraints at around 7:30 p.m., which consisted of a set of wrist and leg restraints that are not rigid and allow the inmate to move around inside an observation cell. Bagu was taken to the SHU, where he was searched, placed in alternate clothing, and medically assessed. (*Id.* at 5). He was found to have a small contusion on the upper part of his head, but no other injuries were noted. Bagu was placed in an observation cell and monitored throughout the night until around 1:30 p.m. the following day when the restraints were removed. (*Id.* at 6).

Austin explains that a 583 packet was prepared regarding the events of March 8, 2021. (ECF No. 39-1 at 6). A 583 is the name given to the documentation required by the BOP when force is applied to an inmate. The 583 reflects Bagu's behavior in his cell, his assault on Crawford, and Bagu's transfer to the SHU. Austin claims that no documentation exists to corroborate Bagu's claim of additional applications of force, or attacks by correctional officers. (*Id.*). Austin confirms in his declaration that the records were prepared in accordance with BOP policy. He emphasizes that there are no reports of pain or injury by Bagu and, other than the small contusion, no injuries were observed. (*Id.* at 7). The documentation of March 8, 2021 was subsequently reviewed by executive staff at FCI Beckley, in keeping with BOP policy, and no incidents of staff misconduct were identified. (*Id.*).

8

According to Austin, two and one half weeks after the incident, on March 26, 2021, Bagu sent a letter to SIS alleging staff misconduct on March 8, 2021. (ECF No. 39-1 at 7). His claims were referred to the OIA and the Department of Justice's Office of the Inspector General ("OIG"), who conducted an investigation, which included a review of records and video surveillance tapes, as well as interviews of Bagu, inmate witnesses, and staff members. (*Id.* at 8). The investigation revealed no staff misconduct. To the contrary, Bagu received an incident report for assaulting Crawford and was found to have committed the infraction. Bagu did not challenge the disciplinary finding. (*Id.*).

Austin states that, while in the SHU, Bagu and the other inmates were observed daily by correctional staff making rounds. During these rounds, inmates are free to address concerns with staff, as well as make requests to pass messages to other departments as needed. (ECF No. 39-1 at 8). In addition, the Warden and Associate Wardens made weekly rounds in the SHU. Austin adds that Bagu had ready access to medical and psychiatric services, as medical and psychiatric staff make daily rounds in the SHU. (*Id.*). Inmates are permitted to submit sick call requests during daily rounds for assistance with non-urgent health care needs, and each inmate has a duress button in his cell to alert staff to emergency situations. (*Id.*). Once Bagu reported staff misconduct and sexual abuse, he was immediately evaluated by health and psychiatric services. (*Id.* at 9). When interviewed, he denied being injured. Bagu did not report any permanent injuries, mental health concerns, or ongoing pain at any time thereafter. (*Id.*). At one point, he offered to "drop all of this" if staff would give him back his watch. Austin states that Bagu reported his watch as stolen, but his property was unsecured and spread on the floor of the cell when he threw it there the day of his transfer to the SHU. (*Id.*). Austin indicated that inmates are responsible for securing their belongings in the lockers provided. (*Id.* at

10).

2.  An inmate history showing all of the facilities at which Bagu has been housed since entering the BOP's custody. (ECF No. 39-1 at 11-15).

3.  An inmate history showing Bagu's housing assignments at each facility. (*Id.* at 16-21).

4.  The Form 583 prepared on March 8, 2021. (*Id.* at 22-26). The Form confirms that correctional staff used force to control Bagu in response to his disruptive behavior, assault, and attempted assault on correctional staff. The Form indicates that Officer Young applied hard, ambulatory restraints to Bagu on March 8, 2021 at 7:30 p.m., and that the force used was unplanned. The Form includes a description of the disruptive behavior, which began at 7:11 p.m., and reports that the Warden was contacted and authorized the continuation of restraints in the SHU until Bagu could demonstrate a pattern of non-disruptive and calm behavior. Attachments to the Form 583 include video surveillance, photographs, staff memoranda, medical assessments, incident reports, restraint forms, and rosters.

5.  Surveillance videotapes taken in the unit and the compound purportedly on March 8, 2021. (ECF No. 39-1 at 27-28). The video taken in the unit is grainy, is not accompanied by audio, and is not at a close angle. Because of these deficiencies, the video is not clear enough to identify any of the people being filmed. The video shows an inmate, supposedly Bagu, coming out of his cell and placing his hands against the wall. Correctional staff begin to pat him down. During the pat down, Bagu's left hand comes down from the wall toward his mid-section, and the correctional staff tackle him. The video is not clear as to what occurred just prior to the tackle. After Bagu was tackled, he was placed in handcuffs and pulled to his feet by staff. He walked out of the unit

accompanied by correctional officers. He did not have any apparent physical injury and certainly no injury that affected his ability to walk. (ECF No. 39-1 at 27)

The video taken in the compound is likewise grainy, unaccompanied by audio, and filmed at a distance. (*Id.* at 28). The video shows two people walking on a sidewalk between buildings. Presumably the figure on the left of the video is Bagu, and the officer is on the right. After walking a short distance, the officer tackles Bagu to the ground. Other correctional officers run toward the two, but all that is visible on the film is a group of people. The video does not clearly show what any of them are doing.

6. Medical Records pertaining to Bagu that were created between December 2020 and December 2021. (ECF No. 48 at 1-166). According to the records, Bagu was examined on March 8, 2021 at 8:33 p.m. for an injury assessment. (*Id.* at 38-41). He refused to participate in the pain scale, provided no statement, and reported no symptoms. The examining EMT noted that Bagu was uncooperative. His examination was normal except for a hematoma and contusion on the upper part of his head. The EMT looked at Bagu's head, neck, front and back of upper torso, and bilateral extremities with no other injuries found. Bagu was next examined at FCI Beckley on April 1, 2021 after his PREA allegation. (*Id.* at 34-37). He did not complain of pain or any related symptoms. His physical examination was completely normal, and he denied having any injury at that time. (ECF 48 at 34-36). The remaining records from FCI Beckley reflect no new or ongoing symptoms related to the use of force on March 8, 2021. Records prepared at Federal Correctional Center ("FCC") Hazelton, which was the facility to which Bagu was transferred after his stay at FCI Beckley, do not show any evidence of permanent injury or complaints related to the incidents of March 8, 2021. (*Id.* at 4-28).

7. A photograph of Bagu taken at 7:35 p.m. in the SHU. (ECF No. 39-4 at 2). He

appears to be lying down on a cot and his eyes are closed.

8. An audio/videorecording taken during Bagu's medical assessment on March 8, 2021. (ECF No. 39-4 at 3). Bagu is handcuffed and shackled. A pat down of Bagu is conducted, and then the examination proceeds. A contusion is apparent on the right side of Bagu's face, and he moans throughout the examination as if he is in severe pain. He is held up by correctional officers and ultimately is half-dragged to a cot in an observation room where he is laid down. He shrieks in pain when his right arm is lifted to apply a blood pressure cuff. However, there are no apparent bruises on his ribs or arms at that time. After the examination, Bagu is left laying half on the cot and half off, and the cell door is closed and locked. Each correctional officer then states his role in the use of force, transport to SHU, and medical examination. A description of the incident is placed on the record.

9. The BOP's Program Statement regarding the use of force and application of restraints. (ECF No. 39-4 at 4-27).

10. Fifteen Minute Restraints Check Forms, Health Services restraint Review Forms, and Two-Hour Lieutenant Restraints Check Forms, which detail observations made by correctional staff during the period of time that Bagu was in restraints. (ECF No. 39-4 at 28-37).

11. A Form 586 After Action Review Report, which states that Bagu was in restraints from 7:30 p.m. on March 8, 2021 until 1:30 p.m. on March 9, 2021. (ECF No. 39-4 at 39-40). The review found that the actions of the correctional officers with respect to the use of force and restraints were "reasonable and appropriate." (*Id.* at 39).

12. A Discipline Hearing Officer Report concerning Bagu's behavior on March 8, 2021. (ECF No. 39-4 at 41-45). The report indicates that Bagu was not charged with an

infraction until  March 22, 2021. He was accused of Assaulting Without Serious Injury, which is a violation of Code 224. A hearing was held on the charge on April 15, 2021 before Discipline Hearing Officer ("DHO") M. Leslie. (ECF No. 39-4 at 41-45). At the hearing, Bagu denied the charge, indicating that he never tried to assault any correctional officer. An inmate provided a statement in support of Bagu. The inmate stated that Bagu was searched by Crawford, who told Bagu to pull his pants up. Bagu did not appear to hear Crawford at first, so Crawford repeated the order. At that point, Bagu reached down toward his pants, and Crawford slammed Bagu to the ground, pushed the SOS button, and began to handcuff Bagu. The DHO found Bagu guilty of the code violation on the basis that the correctional officer was more credible than Bagu and his witness. Bagu was punished with the loss of 27 days of good conduct time and was placed in disciplinary segregation for fourteen days. The report was not completed until August 6, 2021, and was given to Bagu on September 3, 2021.

13. Psychological records of Bagu prepared by BOP staff. (ECF No. 48-1 at 1-23). These records reflect that Bagu complained of anxiety, persistent worry, depression, panic, and stress well before the events of March 8, 2021. The records also indicate that Bagu had been charged with assaulting staff at FCI Beckley in 2019 and appeared to be using drugs at the time. In the days and months after March 8, 2021, Bagu reported to psychology services on April 1, 2021 that two officers grabbed his genitals when they were putting him in SHU clothing on March 8, 2021, and this caused him mild distress. However, Bagu refused to fully participate in all other visits with psychology staff between March 8, 2021 and July 2021 when he was transferred out of FCI Beckley. An initial intake assessment was performed on August 12, 2021 at FCC Hazelton when Bagu was moved to that facility. (ECF No. 48-1 at 17). Bagu did not complain of any psychological symptoms,

13

although he did have a history of taking psychotropic medications. He also had a previous diagnosis of Cannabis Use Disorder and Stimulant Related Disorder. The psychologist found Bagu's mood, thoughts, and functioning to be normal, concluding that Bagu did not need routine psychological monitoring. (ECF No. 48-1 at 17).

14.  An Inmate Personal Property Record completed on March 10, 2021 by Bagu, showing that he had a watch and that some of his belongings were missing. (ECF No. 39-5 at 1-2).

15.  A Declaration of Jeremy James, who is a correctional counselor at FCI Beckley. (ECF No. 39-2 at 2-3). James states that his job duties include handling requests from inmates for informal resolution forms (BP-8) and administrative remedy forms (BP-9, BP-10, BP-11). He explains how an inmate on the SHU can request a remedy form, indicating that a representative from the Unit Team is required to perform rounds once per day in the SHU, so that inmates can voice their requests. Inmates can hand their informal resolution and administrative remedy forms to any staff member to pass on to the Unit Team to process. James indicates that Bagu was incarcerated in FCI Beckley from December 5, 2019 through July 27, 2021, and Bagu was assigned to James from January 15, 2020 through July 27, 2021, including the time frame that Bagu was in the SHU, which started on March 8, 2021 and ended on July 27, 2021. James states that Bagu did not request an informal resolution form or administrative remedy form from James at any time while he was incarcerated at FCI Beckley. Bagu did request a property claim form, which James provided to him. James adds that property claims forms are requested in the same manner as administrative remedy forms.

16.  A Declaration of Destiny Spearen, paralegal for the Consolidated Legal Center at FCI Beckley. (ECF No. 39-3 at 2-4). Ms. Spearen explains the BOP's informal resolution

14

and administrative remedy process and indicates that she reviewed the records pertaining to Bagu's use of the process. She states that Bagu did not file a single administrative remedy while incarcerated at FCI Beckley, or any other BOP facility, prior to the date of her records review. With regard to the administrative remedy process at FCI Beckley, Spearen examined the relevant records dated March 1, 2021 through July 31, 2021 and found that inmates at FCI Beckley had submitted 55 institutional remedies, 57 regional office appeals, and 26 central office appeals, for a total of 138 administrative remedies during the five-month period encompassing Bagu's transfer to the SHU on March 8 through his transfer to another correctional facility in July 2021. Ms. Spearen states that the administrative remedies filed by other inmates cover a range of topics, including complaints alleging staff misconduct. Ms. Spearen confirms that, while Bagu did not file an informal resolution or administrative remedy form, he did file a property claim. Attached to Ms. Spearen's declaration is an administrative remedy retrieval form showing that Bagu had not filed any remedy forms as of December 22, 2021, as well as a print-out summarizing the 138 forms filed during the relevant period by other inmates. (ECF No. 39-3 at 6-22). The print-out corroborates Ms. Spearen's representation that staff misconduct was the subject of multiple remedy forms.

### III.   Standard of Review

As a preliminary matter, the undersigned notes that Bagu filed his complaint *pro se*. The law is well-settled that courts must liberally construe *pro se* complaints. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). However, even under this less stringent standard, Bagu's complaint still must contain sufficient factual allegations to support a valid legal cause of action. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). The Court may not rewrite the pleading to include claims that were never presented,

*Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), construct Bagu's legal arguments for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985). Here, Defendants seek dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 56.

### A. *Rule 12(b)(1)*

A motion under Rule 12(b)(1) challenges a court's subject matter jurisdiction over the pending dispute. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). A Rule 12(b)(1) motion can be presented in two ways. First, the movant may contend—as in this case— that a pleading "simply fails to allege facts upon which subject matter jurisdiction can be based." *Adams*, 697 F.2d at 1219. When presented with this contention, the court assumes that the allegations in the complaint are true and affords the petitioner the same procedural protection he would receive under Rule 12(b)(6). *Id.* Second, the movant may raise a factual attack against the complaint, alleging that the jurisdictional allegations of the complaint are not true. *Id.* Then, a court "is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams*, 697 F.2d at 1219). The burden of proving that a court has subject matter jurisdiction rests with the petitioner, as he is the party asserting it. *Johnson v. N. Carolina*, 905 F. Supp. 2d 712, 719 (W.D.N.C. 2012). However, the court should grant dismissal "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

### B. *Rule 12(b)(6)*

A motion under Rule 12(b)(6) addresses whether the plaintiff's complaint includes sufficient factual allegations to state a claim upon which relief may be granted. A complaint fails to state a claim when, viewing the factual allegations as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679. Determining whether a complaint states a facially plausible claim for relief is a "context-specific task that requires the court to draw on its judicial experience and common sense." *Id.* (citing *Iqbal v. Hasty*, 490 F.3d 143, 157–158 (2nd Cir. 2007)). In deciding a Rule 12(b)(6) motion, the court must accept as true all of the factual allegations contained in the petition. *Erickson v. Pardus*, 551 U.S. 89 (2007). Nonetheless, the court is not required to accept the legitimacy of legal conclusions. *Iqbal*, 556 U.S. at 678. To survive a motion to dismiss, a petition must plead both a factual and legal basis for relief. *Id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to establish a facially plausible complaint).

### C. *Rule 56*

Under Rule 56, summary judgment is proper when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 501 U.S. at 248. Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). The court shall "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991).

Nonetheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson, Inc.*, 477 U.S. at 247-48. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). "[A] party's 'self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc., v. Hog Slat, Inc.,* 954 F.3d 647, 658-59 (4th Cir. 2020) (citation omitted). While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be

18

granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50). Likewise, a mere scintilla of evidence supporting the case is insufficient to overcome a motion for summary judgment. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Furthermore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Because Defendants have supplied materials that are not referenced in or intrinsic to the complaint, the undersigned has assessed Bagu's claims and the dispositive motion under the standards of Rule 56. *See, e.g., Hancock v. LaFave*, No. 7:20CV00687, 2022 WL 726913, at *2 (W.D. Va. Mar. 10, 2022). The undersigned again notes that Bagu received an order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising him of his right to file a response to Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. (ECF No. 43). Bagu was told that declarations filed by Defendants would be accepted as true unless Bagu set forth facts in response indicating the existence of a genuine issue of material fact. (*Id.*). Bagu was instructed that he could set out the factual dispute through his own sworn statement, or with other evidence, such as witness statements. He was also advised that if he provided specific reasons as to why he could not present facts in opposition to the dispositive motion, the court could defer the motion, or deny it, in order to allow him "time to obtain affidavits or declarations or to take discovery" as permitted under Fed. R. Civ. P. 56(d). (*Id.*). Finally, Bagu was advised that a failure to respond to the motion might result in a recommendation of dismissal. (*Id.*). Despite these admonishments, Bagu did not file a response or provide reasons to delay resolution of the motion.

## IV.    __Discussion__

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), requires inmates to exhaust administrative remedies prior to filing a complaint in federal court. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). "Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory. All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy, and effective. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter v. Nussle,* 534 U.S. 516, 524 (2002) (citations and internal quotation marks omitted). The exhaustion requirement applies to cases filed pursuant to *Bivens*, as well as to other civil rights actions. *Hill v. O'Brien,* 387 Fed. Appx. 396, 399 (4th Cir. 2010); *Sallee v. Joyner*, 40 F. Supp. 2d 766, 768 (E.D. Va. 1999). However, administrative exhaustion is "not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner." *Hart v. Roderick,* No. CV GLR-15-2054, 2016 WL 3940219, at *3 (D. Md. July 21, 2016) (citations omitted). Instead, lack of exhaustion is an affirmative defense, and the defendant bears the burden of proving that a prisoner failed to exhaust administrative remedies. *Id.*

The Supreme Court of the United States has repeatedly held that courts may not read futility or other exceptions into the PLRA that are not part of its textual mandate. *Ross v. Blake,* 578 U.S. 632, 639 (2016) (holding that "[m]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion."). Nevertheless, the Supreme Court pointed out that the PLRA does contain one explicit

exception to the exhaustion requirement; an inmate need not exhaust "unavailable" remedies. *Id.* at 642. The Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide relief to aggrieved inmates." *Id.* Second, an administrative process is similarly unavailable when it is "so opaque" that "no ordinary prisoner can discern or navigate it." *Id* at 643-44. Finally, an inmate need not exhaust administrative remedies when prison officials thwart the inmate's access to the grievance procedure "through machination, misrepresentation, or intimidation." *Id.* at 644. "[S]uch interference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.* Put simply, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). The prisoner bears the burden of establishing that an administrative remedy was unavailable. *Graham v. Gentry,* 413 Fed. Appx. 660, 663 (4th Cir. 2011). "Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, that exhaustion occurred or that administrative remedies were unavailable." *Knutson v. Hamilton*, No. 7:20-CV-00455, 2021 WL 4163981, at \*3 (W.D. Va. Sept. 13, 2021) (citations omitted).

The BOP has developed a four-step administrative process to address inmate grievances. *See* 28 C.F.R. § 542.10, *et seq*. First, the inmate is required to seek informal resolution of the issue with facility staff by filing Request for Administrative Remedy Form BP-8. If that step proves fruitless, the inmate proceeds to the second step, which

requires him to file a written Form BP-9 addressed to the warden of the facility. *Id.,* at §

542.14(a). The BP-9 must be submitted within twenty days of the occurrence on which

the grievance is based. *Id.* If the warden provides an unsatisfactory response, the inmate

has twenty days to appeal to the BOP's Regional Director, using Form BP-10. *Id.,* at §

542.15(a). If the Regional Director's response does not resolve the matter, the inmate

must seek relief by appealing the Director's response within thirty days to the Office of

General Counsel, using Form BP-11. *Id.* An unresolved grievance is not exhausted until

the inmate has performed all four steps. *Gibbs v. Bureau of Prison Office,* 986 F. Supp.

941, 943 (D. Md. 1997). In addition to this four-step process, the BOP allows an inmate

to file a "sensitive" administrative remedy form directly with the appropriate Regional

Director. 28 C.F.R. § 542.14. Using this form, the inmate can file a remedy request without

staff members at the prison being able to see the grievance.

Here, Bagu concedes in his complaint that he did not file an administrative remedy

protesting the alleged assaults that occurred on March 8, 2021, even though he knew that

FCI Beckley followed the BOP's administrative remedy process. (ECF No. 1 at 4). As such,

it is undisputed that Bagu did not exhaust administrative remedies prior to filing the

instant action, and the defendants have met their initial burden to show a lack of

exhaustion. The burden now shifts to Bagu to demonstrate that the administrative remedy

process was not available to him. When asked in the form complaint to explain why he

did not file an administrative remedy, Bagu stated that his "counselor and unit manager

denied me the right to obtain a grievance form. Then they told me they'd send me one but

never did." (ECF No. 1 at 4). Thus, Bagu implicitly claims that the administrative remedy

process was unavailable to him through the machinations of correctional staff. To

establish his claim of unavailability, Bagu "must adduce facts showing that he was

prevented, through no fault of his own, from availing himself of that procedure." *Graham*, 413 Fed. Appx. at 663. Exhaustion under the PLRA "is a question of law to be determined by the judge." *Creel v. Hudson*, No. 2:14-cv-10648, 2017 WL 4004579, at * 3 (S.D.W. Va. 2017) (quoting *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3rd Cir. 2010)). "Judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." *Woodhouse v. Duncan*, 741 Fed. Appx. 177, 178 (4th Cir. 2018) (citation omitted); *also Bryant v. Rich,* 530 F.3d 1368, 1373-74, 1376 (11th Cir. 2008) (holding that factual disputes concerning exhaustion may be decided by the court sitting as fact-finder, "so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record."). "[T]he district court may dismiss for failure to exhaust as long as the prisoner has been provided an opportunity to address the issue." *Bustillo v. Beeler,* 495 Fed. Appx. 343, 344 (4th Cir. 2012) (citing *Moore,* 517 F.3d at 725).

The defendants supplied several pieces of probative information relating to exhaustion. First, Jeremy James, who was Bagu's counselor both before and after he was in the SHU, explains in a declaration that one of James's duties at FCI Beckley is to handle requests from inmates for administrative remedy forms and to ensure that the forms are submitted and routed properly. (ECF No. 39-2 at 2). James was assigned as Bagu's counselor from January 15, 2020 through his transfer in July 2021, including during Bagu's stay in the SHU beginning on March 8, 2021. James indicates that Bagu never asked him for any administrative remedy form during the entire time that James was assigned as Bagu's counselor. (*Id.* at 3). James further explains that he is not the only staff member who can provide or receive an administrative remedy form from an inmate. According to James, an inmate in the SHU may request a remedy form from *any* staff member, who will advise the Unit Team of the request. (*Id*. at 2). A representative of the

Unit Team is required to perform at least one round per day in the SHU, specifically allowing inmates to make requests for remedy forms. (*Id.*). In addition, James confirms that Bagu could have sent a sensitive remedy directly to the Regional Office. (*Id.* at 2-3). To send a sensitive remedy, Bagu would have to request the proper form, complete it, seal it, and send it as "special mail" to the Regional Office. No correctional staff at FCI Beckley are able to review the contents of a sensitive remedy. (*Id.* at 3). Bagu does not dispute any of the statements made by James in his declaration.

In addition to James's statements, Destiny Spearen, a paralegal at FCI Beckley, submitted a declaration detailing her review of relevant records. (ECF No. 39-3). She verifies that Bagu did not file a single administrative remedy form while at FCI Beckley, and provides a computer printout corroborating that fact. (*Id.* at 3, 6). Spearen also supplies proof that the remedy process was functional during the relevant time frame by attaching documentation of 138 remedy forms filed by other inmates during the period between March 1, 2021 and July 31, 2021, including at least one remedy form prepared by an inmate in the SHU. (*Id.* at 8-22). The fact that other inmates were able to access the remedy process is not determinative of Bagu's ability to do so, but is one more piece of evidence supporting the conclusion that the process was available. *Hancock v. Smith*, No. 7:20CV00225, 2022 WL 686323, at *4 (W.D. Va. Mar. 8, 2022). Spearen provides evidence that Bagu did complete one BOP form related to the incidents on March 8, 2021, but the form he chose to submit was a property claim form, not a remedy form; the property claim form was prepared on March 10, 2021. (ECF No. 39-5 at 2). Bagu does not dispute the declaration of Ms. Spearen, or the accuracy of the documents provided by the defendants.

Lastly, Michael Austin, SIS Lieutenant, stated in a declaration that Bagu did claim

staff misconduct related to the events of March 8, 2021. (ECF NO. 39-1 at 7). However, Bagu did not assert his claims in an administrative remedy form; rather, he sent a letter making the claims to SIS on March 26, 2021. The letter included a PREA allegation and was handled by the OIA and OIG. (*Id.* at 8). According to Austin, Bagu's allegations of staff misconduct were not sustained by the OIA/OIG investigation; instead, Bagu was charged with a disciplinary violation for his actions on the evening of March 8, 2021. Bagu was found guilty of the violation and was punished. (*Id.*). He did not contest the DHO's finding of guilt or file an administrative remedy protesting the result. Once again, Bagu does not dispute Austin's declaration.

In response to a motion for summary judgment for failure to exhaust administrative remedies, a bare assertion that is 'unsupported by any detail' will not satisfy a prisoner plaintiff's 'burden of showing that remedies were unavailable.'" *Mendez v. Breckon*, No. 7:20-CV-00046, 2021 WL 4268890, at *3 (W.D. Va. Sept. 20, 2021) (quoting *Rodrigues v. Hamilton*, 7:20-cv-338, 2021 WL 413530, *6 (W.D. Va. Feb. 5, 2021)); *also Creel v. Hudson*, No. 2:14-CV-10648, 2017 WL 4004579, at *4–6 (S.D.W. Va. Sept. 12, 2017) ("Unsubstantiated and conclusory assertions by an inmate that prison officials thwarted pursuit of the administrative process are insufficient to excuse failure to exhaust.") (citations omitted); *Tosado v. Gilbert*, No. 7:20-CV-00287, 2020 WL 6487685, at *3–4 (W.D. Va. Nov. 4, 2020) (holding that "numerous courts within the Fourth Circuit and elsewhere have held that 'unsubstantiated and conclusory assertions by prisoner-plaintiffs that prison grievances were hindered, without providing any details regarding the date the alleged grievances were submitted or to whom they were submitted, fail to create a genuine issue of material fact sufficient to withstand summary judgment.'") (citations omitted). Bagu does not challenge the declaration submitted by

25

James. In the attachment to his complaint, Bagu indicates that his case manager, Mr. Harvey, and his Unit Manager, Mrs. Stapples, failed to give him a remedy form, but he does not claim that he asked his counselor, James, for a form. Considering that one of James's duties was to provide remedy forms to inmates and collect completed ones, Bagu's failure to ask James for a form suggests that Bagu did not make much effort to access the remedy process.

Bagu asserts that the case manager and unit manager initially denied him a remedy form, but then later agreed to bring him one. Bagu claims that despite this assurance, neither the case manager nor the unit manger ever brought him the form. However, Bagu does not allege that he followed up with those two staff members, who simply may have forgotten Bagu's request. Bagu does not claim to have reminded the case manager and unit manager to provide the form, or that he repeated the request when the form was not given to him. He provides no evidence that he made any effort whatsoever to obtain a form after his initial request.

Furthermore, Bagu does not refute James's representation that Bagu could have asked any staff member for a remedy form; he was not limited to only making such a request to his case manager or unit manager. Bagu simply does not carry his burden of proof, because he fails to produce any corroboration of his assertion that the remedy process was unavailable him. "To permit a plaintiff to escape exhaustion after such an unsupported statement would eviscerate the exhaustion requirement of the PLRA contrary to Congress's intent." *Hemming v. Hawerd*, No. 5:21-CV-71, 2022 WL 1218034, at *2 (N.D.W. Va. Mar. 10, 2022). Furthermore, Bagu does not explain why he did not request a sensitive remedy form. If Bagu was concerned about lodging a complaint of staff abuse—which he ultimately did in the March 26, 2021 letter to SIS—then he could have

completed a sensitive remedy form. *See Hancock*, 2022 WL 686323, at *6 (citing *Knutson v. Hamilton*, No. 7:20-cv-00455, 2021 WL 388444, at *6 (W.D. Va. Feb. 3, 2021)) (finding that the inmate's failure to file sensitive request was further evidence that administrative remedies were not unavailable).

The record is clear that Bagu did not submit an administrative remedy, or a sensitive remedy. A letter to SIS does not constitute an administrative remedy and is not part of the BOP's clearly-outlined remedy process, which requires completion of four steps. Given that Bagu was aware of the administrative remedy process, but chose not to pursue his complaint by that route, indicates that Bagu made a conscious decision not to file an administrative remedy. Moreover, Bagu's decision not to challenge the disciplinary action related to his actions on March 8, 2021 is further evidence of his decision to abandon his allegations against the correctional staff.

Therefore, the undersigned **FINDS** that Bagu failed to exhaust administrative remedies and has not demonstrated the existence of a genuine issue of material fact regarding the availability of remedy process. Consequently, the complaint should be dismissed.

## V.    Proposal and Recommendations

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the presiding District Judge accept and adopt the proposed findings and **RECOMMENDS** that the presiding District Judge **GRANT** Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, (ECF No. 39), on the ground of failure to exhaust administrative remedies; **DISMISS** the complaint, (ECF No. 1); and **REMOVE** this case from the docket of the Court.

Plaintiff is notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Frank W. Volk, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have fourteen days (filing of objections) and three additional days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding district judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to Judge Volk and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Plaintiff and counsel of record.

**FILED:** July 6, 2022

Cheryl A. Eifert
United States Magistrate Judge

28